**UNITED STATES FEDERAL DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division**

| | |
|---|---|
| **Michelle Yerkin** ) | **Case No__21-3373_____** |
| **5640 Reykjavik Place** ) | |
| **Dulles, VA 20189** ) | |
| **Plaintiff,** ) | **For Violations of Title VII, 42 U.S.C Section 2000** |
| ) | **et seq** |
| **vs.** ) | |
| ) | **JURY DEMAND** |
| **Antony Blinken** | |
| **U.S. Department of State,** | |
| **600 19ᵗʰ Street. Suite No. 5.600** | |
| **Washington, DC 20522** | |
| **Defendant.** | |

## **Introduction**

The Plaintiff Michelle Yerkin is a graduate of Yale University and the University of Minnesota Law School. Yerkin is a Native American female, a descendent of the White Earth Nation of Ojibwe/Chippewa. Yerkin was also previously diagnosed with cancer.

Yerkin has been an employee of the U.S State Department since 2003. She is presently the Charge d'Affaires at the U.S. Embassy in Iceland (Reykjavik). She was the Deputy Chief of Mission (DCM) at the U.S. Embassy in Reykjavik from July 2, 2020, to January 21, 2021.  As the DCM she reported to then Ambassador Jeffery Ross Gunter.

Ambassador Gunter engaged in repeated acts of discrimination and harassment towards Yerkin. During public and private meetings, Gunter would repeatedly refer to Yerkin as "my Native American, female DCM" and that Yerkin was "born on a reservation." Gunter would also assign Yerkin secretarial and menial tasks.  This behavior was not experienced by others outside her protected class.

The State Department always had actual if not constructive knowledge of Yerkin's continued and unwelcomed harassment by Gunter.

After Gunter left his post, Yerkin as is customary and per her position description, was named the Charge d'Affaires (CDA). To the Plaintiff's surprise, she remained in this position for only 3 days from January 21-23, 2021, before the State Department replaced her with Harry Kamian, a Caucasian male. Kamian was named as the temporary (TDY) CDA. This was an unprecedented practice on the part of the Defendant. To the best of Plaintiff's knowledge, no other embassy had a temporary CDA. Plaintiff's demotion from CDA to the DCM hurt her "corridor reputation."[1] Kamian was the temporary CDA until June 2021. During Kamian's tenure as the CDA, he provided the Plaintiff a negative performance evaluation by failing to endorse her for promotion.  This resulted in financial loss and further harm to her "corridor reputation."

Consequently, an action under Title VII now follows for claims of discrimination, harassment, and retaliation.

## Part I. Parties

1. Michelle Yerkin is a Native American female with a record of disability. She was diagnosed with cancer. She has been an employee of the U.S. Department of State since 2003. She is an employee under Title VII, 42 USC § 2000(e) *et seq*.

---

[1]  The Foreign Service uses an informal system called "Corridor Reputation," which is the reputation developed by an officer over years of service.  As described in the New York Times, the "corridor reputation" is a "peer-enforced system with an outsize influence when selecting diplomats for choice assignments."  (*New York Times*, "A Reckoning with Race to Ensure Diversity for America's Face Abroad," June 27, 2020, https://www.nytimes.com/2020/06/27/us/politics/a-reckoning-with-race-to-ensure-diversity-for-americas-face-abroad.html) Ex. **A**.

**2.** The Defendant, Antony Blinken, is the Secretary of State at the U.S. Department of State. The State Department is a federal agency responsible for foreign affairs. The Defendant is an employer under Title VII, 42 U.S.C §2000 *et seq*.

## Part II. Exhaustion of Administrative Remedies

**3.** The Plaintiff Yerkin timely exhausted her administrative remedies by filing a charge of discrimination, retaliation, and hostile work environment with the State Department's Office of Civil Rights (S/OCR). S/OCR is responsible for Equal Employment Opportunity (EEO) complaints at the State Department.

**4.** On October 5, 2021, EEO issued its Final Agency Decision on this matter.

**5.** The Plaintiff timely filed her claim in this Court on Monday December 27, 2021, and within 90 days of receipt of the Final Agency Decision.

## Part III. Jurisdiction and Venue

**6.** This Court has jurisdiction of this action under 28 U.S.C. §1331, 28 U.S.C §1343 (4) and 42 U.S.C. §2000(e)-(5) f in order to protect rights guaranteed Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000 (e) *et.seq*

**7.** Venue is also proper in the District of Columbia, because the State Department is headquartered in Washington, DC, and the Plaintiff's employment records are also in the District of Columbia.

## Part IV. Statement of Facts

**8.** The Plaintiff Michelle Yerkin is currently employed with the Department of State. She has a bachelor's from Yale University and a law degree from the University of Minnesota.

9. Since June 21, 2021, she has served as the Charge d'Affaires of the U.S. Embassy in Reykjavik, Iceland.  She is a Native American woman with a disability. She was previously diagnosed with cancer.

### July 2, 2020 – January 21, 2021: Discrimination and Hostile Work Environment under Ambassador Jeffrey Ross Gunter

10. Ambassador Jeffery Ross Gunter served as the U.S Ambassador in Iceland from June 2019 to January 21, 2021. Gunter was appointed by former president Trump and confirmed by the U.S. Senate. Prior to his ambassadorship, Gunter was employed as a dermatologist.

11. On July 2, 2020, Yerkin arrived in Iceland, to begin her assignment as the Deputy Chief of Mission (DCM) at the U.S Embassy in Reykjavik. Yerkin reported directly to Ambassador Gunter with no other State Department employee in her supervisory chain.

12. Ambassador Gunter reported to the Assistant Secretary for the Bureau of European and Eurasian Affairs (EUR), Philip T. Reeker. Reeker had the responsibility of preparing Ambassador Gunter's evaluation report and holding Ambassador Gunter responsible for his conduct.

13. The Ambassador was supervised on a day-to-day basis by Principal Deputy Assistant Secretary Maureen Cormack and Deputy Assistant Secretary Michael J. Murphy.

14. From the time the Plaintiff arrived in Iceland on July 2, 2020, until the Ambassador departed post on January 21, 2021, the Plaintiff endured frequent, unwelcomed harassment involving her race and gender.

15. For example, Gunter would frequently call the Plaintiff, "my Native American DCM" in public and private meetings. This occurred thirty (30) times or more. Without prompting, Gunter would also frequently announce to third persons and engage in racial stereotypes by falsely stating that, "Yerkin was born on a reservation."

**16.** Yerkin was deeply offended. She was not able to concentrate at work.

**17.** On July 26, 2020, CBS News published an article detailing the Ambassador's mistreatment of previous employees at the U.S Embassy in Iceland. The article cited "a dozen diplomats, government officials, former officials, and individuals familiar with the situation" and described "an increasingly 'untenable' working environment at the Embassy in Reykjavik." (Ex. **B**). This article also reported that previous DCMs were sent back to the United States by Ambassador Gunter for minor infractions.[2]  The Plaintiff too feared she would be removed from her assignment if she complained about Ambassador Gunter's behavior.

**Plaintiff's Protected Activity.**

**18.** The Plaintiff also engaged in protected activity by informing the Ambassador that she was uncomfortable with the references to her race and Native American heritage. Gunter ignored her complaints. The harassment continued.

**19.** As many of the discriminatory and disparaging remarks were made within earshot of Human Resource Officer (HRO) Scott Dargus, Dargus too was made aware of the harassment. Dargus in his affidavit provided to the Agency also admits having knowledge of the harassment. *See Report of Investigation, Yerkin v. State Department*, Case No. DOS 21-0081, pg. 21 of 33 of investigative summary (July 26, 2021).

---

[2] CBS News Article, "Controversial U.S. Ambassador to Iceland Wanted Firearm, Security for Reykjavik Post," July 26, 2020, https://www.cbsnews.com/news/controversial-u-s-ambassador-to-iceland-wants-firearm-security-for-reykjavik-post/

**Plaintiff Subjected to Online Ridicule Due to Unwelcome Comments about Race and Gender on Official Embassy Social Media Accounts**

20. On July 27, 2020, Ambassador Gunter posted on Facebook and Twitter that Yerkin was Native American and that when Yerkin was a child, she received health care through the Indian Health Service.

21. This was a violation of Yerkin's health care records and played into the stereotype of Native Americans' poverty and reliance on the Federal government. The post, which was published the day after the CBS News article, generated dozens of comments, including one attacking the Plaintiff personally, saying "Pocahontas much?"

22. Other Embassy posts about the Plaintiff's race and ethnicity resulted in unwelcome online attention toward the Plaintiff on social media.

**EUR Officials Clearly Aware of Harassment**

23. State Department Officials had actual or constructive knowledge of Ambassador Gunter's harassment of Yerkin, and/or the Ambassador's postings of Yerkin's race and ethnicity on the State Department's Facebook and Twitter pages.

24. In their affidavits, both Principal Deputy Assistant Secretary (PDAS) Maureen Cormack and Deputy Assistant Secretary (DAS) Michael Murphy cited the Ambassador's use of social media as a concern.

25. The Ambassador's frequent and harassing comments on Yerkin's race and ethnicity made Yerkin feel like a "token" minority. They were also humiliating to Yerkin because it distracted from her impressive service as a diplomat for the United States.

26. No other employee in Iceland was also introduced by her race or ethnicity to members of the public or Icelandic's diplomatic corp.

27. The unwelcome social media posts about the Plaintiff's race and ethnicity were deeply offensive to the Plaintiff.

28. Yerkin grew up in a rural area in the 1980s with a lot of anti-American discrimination.  The Plaintiff experienced racism as a child and did not always self-identify as Native American because of the discrimination.  The Plaintiff also felt that the unwanted focus on her ethnic and racial background detracted from her qualifications and implied that she only got the job because she was Native American.

29. Nearly every American officer at US Embassy Reykjavik testified to having witnessed the Ambassador refer to the Plaintiff by her race and gender.

30. Yerkin was the only employee who was referred to by her race and gender by Gunter.

31. Gunter also bullied and intimidated Yerkin. For instance, he forbade Yerkin from communicating with anyone in Washington without his prior approval. He also forbade Yerkin from sending any work-related emails without his approval. Gunter treated Yerkin like a secretary.

32. Gunter also frequently stood over Yerkin in an intimidating manner, dictating emails that he made her send to people in the Department, often in a harsh, offensive, and rude tone, which further damaged her "corridor reputation."

33. In public meetings, Gunter would also take off his COVID-19 face mask, and hand it to Yerkin. As Gunter was aware that Yerkin was a cancer survivor and with a compromised immune system, Yerkin felt that Gunter was disparaging her disabilities, or showing a lack of reasonable care.

34. This continued practice of Gunter having Yerkin hold his face mask was humiliating and offensive to Yerkin. It could have also compromised Yerkin's health.

**35.** Gunter also engaged in other tasks that were humiliating to Yerkin. He had Yerkin be responsible for "flags in the cookies."  He also made the Plaintiff pour tea and coffee during meetings with the public.

**36.** None of the men were ever asked to pour tea or take responsibility for cookies.

**37.** On January 13, 2021, one of the local staff with responsibility for taking photos of events for social media, reported that the Ambassador had instructed him to take fewer pictures of the Plaintiff.

**38.** The local staff reported that the Ambassador frequently rejected photos of women.

**39.** This is also evidenced by the dearth of women on the Embassy's official social media accounts from December 2020 – January 2021.

**40.** On January 14, 2021, the Ambassador dismissed the Plaintiff from a meeting with business contacts, citing COVID-19 risks.  However, he allowed a lower-ranking, white, male colleague, Sean Greenley, to attend.

**Ambassador Gunter Forbids Communication with Washington Officials**

**41.** The Ambassador forbade anyone, including the Plaintiff, from talking to EUR officials in Washington, DC, and he threatened to send people home if they disobeyed his instructions. These threats hampered the Plaintiff's ability to communicate with EUR officials in Washington, DC.

**42.** The Office of the Inspector General, during their February 2021– April 2021 inspection of Embassy Reykjavik, found "…At the time of the inspection that embassy staff were still recovering from what they described as a threatening and intimidating environment created by the former Ambassador.  For example, staff reported to OIG multiple instances in which the former Ambassador had threatened to sue Department officials and embassy staff who

expressed disagreement with him, questioned his wishes, or were perceived to be "disloyal" to him.  In addition, many employees reported to OIG that the former Ambassador threatened reprisal against employees who communicated with Department officials in Washington while conducting their official duties."[3]

### January 21 – 23, 2021:  Plaintiff Assumed Charge d'Affaires Role

**43.** On January 21, 2021, Gunter departed his post as Ambassador to Iceland.

**44.** In the absence of an Ambassador, Plaintiff as the Deputy Chief of Mission, assumes the role as the Charge d'Affaires (CDA).  Upon information and belief, Plaintiff was also the only Native American employed as a CDA.

**45.** The Plaintiff embraced the role as the CDA, and so did her subordinates.  During a widely attended social event in the evening of January 21, 2021, nearly every member of the staff – both local and American – expressed to the Plaintiff their support and excitement to have her in the role of CDA.

**46.** On January 22, 2021, the Plaintiff held a townhall with employees to discuss her leadership style and the challenges of normalizing embassy operations after the Ambassador's tumultuous tenure.

### January 24, 2021 – June 14, 2021: Plaintiff Demoted on the Basis of Her Race and Gender by the Appointment of White Male as CDA

**47.** However, 48-hours later – on January 24, 2021 – Harry Kamian (white male) arrived as the temporary duty (TDY) Charge d'Affaires.

---

[3] OIG Final Inspection of Embassy Reykjavik
https://www.oversight.gov/report/DOS/Inspection-Embassy-Reykjavik-Iceland

48. This was an unprecedented appointment on the part of the Defendant. Upon information and belief, Embassy Reykjavik was the only post in EUR and perhaps in the world that had a temporary CDA brought in immediately after the Ambassador's departure.

49. By so doing, the Defendant denied the Plaintiff the opportunity to serve any significant length of time as CDA.  The State Department's 2020 promotion numbers (the most recent statistics available), also show that Native Americans have the lowest levels of promotion of any racial or ethnic group in the Foreign Service.  In fact, of the 5 Native Americans in the Foreign Service eligible for promotion in 2020, 0 were promoted.  The promotion rate for Native Americans is 0%.  This is compared with 22% for whites, 22.6% for African-Americans, and 10.2% for Asian-Americans.

50. Plaintiff reasonably believes that the appointment of Kamian as the temporary CDA was because of the Defendant's discrimination towards Plaintiff's race and ethnicity, and retaliation for her prior protected activities.

51. Kamian's appointment as the CDA resulted in a demotion of the Plaintiff from the position and resulted in tangible losses, including loss of special pay for serving in the role of Charge d'Affaires.

52. Kamian also took the Plaintiff's administrative assistant (or Office Management Specialist), depriving the Plaintiff of administrative support.  Kamian's appointment also resulted in the Plaintiff being rated at a lower level than all the other Deputy Chiefs of Mission (DCMs) who had been allowed to serve as CDA.  Instead of being rated by the Assistant Secretary, the Plaintiff had to be rated by Kamian, since he remained at post as her supervisor for more than 120 days.

**53.** As the only DCM in the EUR bureau who had a temporary CDA assigned above her in January 2021, the Plaintiff also suffered damage to her "corridor reputation," a peer-enforced system with an outsize influence when selecting diplomats for choice assignments. (Ex. **A**)

**54.** Under Secretary Bulato in his action memo, justified Kamian's appointment on the grounds that, "The needs of the Service require Mr. Kamian's talent, expertise, and knowledge in this critical role" and "EUR and Mission Iceland cannot afford to be without an experienced leader in the Chief of Mission role."

**55.** In this memo, EUR implied that the Plaintiff lacked "talent, expertise, and knowledge" and leadership experience. The Plaintiff described Kamian's appointment as "humiliating, offensive, and discriminatory" and "based on a false assumption that there is a lack of leadership at post."

**56.** Moreover, the Plaintiff had served at an equal number of overseas posts as Kamian. Kamian's overseas experience included tours in Vietnam, Chile, Turkey, Cuba, El Salvador, and Austria.

**57.** The Plaintiff's overseas experience included tours in Kazakhstan, Panama, Kyrgyzstan, El Salvador, and Russia (two consecutive tours).  Other DCMs, including white females, had spent less time in the DCM role than the Plaintiff, and yet, they were allowed to serve as CDA when their political ambassadors left post.

**58.** For example, the DCM to Dublin – a white female – only arrived at post in late September 2020 and was allowed to immediately assume the CDA role upon the departure of the political appointee ambassador on January 19, 2021.

**59.** Murphy in his affidavit pointed out that two other white women were allowed to serve in the DCM role – a white woman in London and a white woman in Stockholm.

60. This strengthened Yerkin's belief that she was denied the opportunity to serve as CDA immediately upon the Ambassador's departure, due to bias, retaliation and discrimination against her, as a Native American woman.

**Kamian's Continued Pattern of Hostile Work Environment**

61. Prior to Kamian's arrival, the Plaintiff sent an email to Kamian on January 16, 2021, offering suggestions to improve the morale of the staff, and offered ways to improve relations with the government of Iceland. In a subsequent "townhall" on January 25, 2021, Kamian presented those ideas as his own, as "immediate changes," almost verbatim, without giving credit to the Plaintiff.

62. During this January 2021 period, Yerkin also informed Kamian of her prior complaints of discrimination to Gunter and Gunter's discriminatory and harassing behavior towards her.

63. Kamian, like Gunter, seldom took the Plaintiff to external meetings or events.  He designated her to do much of the "grunt work" of the Embassy, including coordinating the OIG inspection and serving as a "control officer."

64. This is work not typically assigned to a Deputy Chief of Mission.

65. Kamian would be threatened whenever the Plaintiff had an opportunity "to shine."  For example, Kamian was upset with another officer who asked the Plaintiff to attend an event when Kamian was on vacation. In so doing, he implied that the Plaintiff was unable to represent the embassy at the event.

66. Kamian's appointment also gave the impression that the Plaintiff had been fired. For example, Kamian arrived with great fanfare.  An article in the local English-language

newspaper wrote "A new deputy ambassador was appointed as interim head of the U.S. Embassy.[4]"

67. "Deputy Ambassador" is equivalent to "Deputy Chief of Mission," and the article implied the Plaintiff had been replaced.  However, the Embassy press office did not correct the record. Embassy employees reported to the Plaintiff that Icelandic contacts asked them whether the Plaintiff, too, had been a political appointee and had been replaced.

68. Secretary Blinken's May 19-21, 2021, visit to Reykjavik further illustrated the Plaintiff's invisibility.

69. The Plaintiff was devastated when the Secretary neglected to thank her during his "Meet and Greet."  As overall control officer and one of the senior leaders of the Embassy, her name had been in the Secretary's draft remarks, but when the Secretary delivered remarks, the Plaintiff was left off and Kamian got all the credit. Secretary Blinken said, "Thank you both for that introduction, but especially for your leadership of this mission. It is greatly appreciated, greatly recognized, and we had a terrific day today, which I'm sure you'll hear more about in the days to follow.[5]"

70. The erasure of the Plaintiff from the remarks speaks volumes about her invisibility as a Native American woman at the Department of State.

71. Kamian's appointment undermined the Plaintiff that after his departure on June 14, 2021, (which was done quietly, in contrast to his arrival), it took months for the Plaintiff to reestablish herself in the role of Charge d'Affaires.

---

[4] "Iceland's US Embassy Under New Management," *Reykjavik Grapevine*, January 29, 2021; https://grapevine.is/news/2021/01/29/icelands-us-embassy-under-new-management/
[5] Secretary Antony J. Blinken to Embassy Staff and Families, https://www.state.gov/secretary-antony-j-blinken-to-embassy-iceland-staff-and-families/

**72.** As late as November 5, 2021, the official Embassy website still linked to Kamian as the "Ambassador," despite many requests by the Plaintiff and other Embassy officials for responsible office in Washington to change that link to the Plaintiff's name and bio.

**June 14, 2021 – August 29, 2021: Retaliation for Protected EEO Activity**

**73.** Beginning in May 2021, Kamian began talking about leaving Reykjavik sometime in June 2021.  Plaintiff was told by Cormack that she would be the CDA after Kamian's departure.

**74.** State Department regulations state that evaluation reports must be completed for all employees who have been supervised for 120 days or longer. This meant that Kamian was responsible for completing Plaintiff's evaluation.

**75.** The State Department regulations are very clear about the procedures for completing employee evaluations.  They must be completed before a rater or reviewer departs post (3-FAH 1. H-2815.4) and must be completed within 30 days of the end of the rating period (3-FAH-1 H-2814.2 (c)).  In the event a supervisor is unable to complete an evaluation, the regulations permit the Bureau Executive Director or Principal Officer abroad to designate a rating/reviewing officer (3-FAH-1 H-2811.2(a)).   The regulations also hold senior officials responsible for ensuring the timely completion of evaluations: "Assistant secretaries, chiefs of mission, and other officers in senior positions are expected to assure this important duty is carried out properly by their subordinates and themselves."

**76.** The Plaintiff sent Kamian points to assist in completing the employee evaluation report ("EER") on June 6, 2021.  From June 11, 2021 – June 21, 2021, the Plaintiff had scheduled annual leave in the United States.  Before departing, the Plaintiff reminded Kamian to complete the EER.  He responded that he did not want to be rushed but would complete it before leaving post on his scheduled departure date, June 22, 2021.

**77.** On June 15, 2021, the Plaintiff learned that Kamian had departed post unexpectedly for a family emergency.  Ordinarily, if neither the CDA (Kamian) nor the DCM (the Plaintiff) are in country, the State Department sends a temporary chief of mission to be in charge.  The procedures require that there be a "double absence" memo approved by Washington senior officials.  None of this was done.  Despite the Plaintiff's constant availability by email and telephone, Kamian did not inform her he had left post.

**78.**  On June 15, 2021, the Plaintiff emailed Cormack and Murphy to ascertain whether the Plaintiff needed to return to post (again, this would be the normal procedure when the chief of mission departed post).  They told the Plaintiff they were entrusting the Embassy to the white, male Management Counselor until the Plaintiff's scheduled return to post on June 21, 2021.

**79.** Upon arriving back in Iceland on June 21, 2021, the Plaintiff continued to try to ascertain whether Kamian was returning to post.  She needed confirmation of whether Kamian had permanently departed post in order to implement various administrative requirements, such as to formally execute a transfer of authority, inform the Ministry of Foreign Affairs, inform other embassies and official contacts, and take over the contract for the Embassy chef (during this time, she was not using the chef but ultimately had to pay for several weeks that the chef was employed by Kamian and not working).

**80.** By early July 2021, the Plaintiff became concerned that Kamian had not completed her EER prior to departure. The EER was due within 30 days of the end of the rating period (i.e. July 14, 2021).  The Plaintiff asked post's human resources officer to remind her supervisor of his obligation to complete the report.  Kamian informed HR that due to his father's death, he was unable to complete the evaluation.

81. On July 8, 2021, the Plaintiff contacted the Bureau's human resources officer directly to ask how to proceed.  She was concerned that she would be blamed for the late evaluation.  On July 8, 2021, she also contacted Kamian directly.  Kamian responded, "As I am sure you are well aware, I have been dealing with a variety of important, pressing personal matters since having to unexpectedly depart post on EVT (emergency visitation travel), including the death of my father, and other elder care issues involving my family, in addition to trying to finalize/pack out from my TDY assignment in Iceland and my regular assignment here in Vienna.  As a result, I have not had the time to complete a draft interim rating officer statement for you, for abbreviated rating period of January 25-June 14." (Email from Harry Kamian, July 8, 2021)

82. While Plaintiff was sympathetic to Kamian's family emergency, the regulations do not make exceptions for family emergencies.

83. When Kamian was unable to complete the EER, procedures dictated that he should have designated someone else to complete it.

84. Furthermore, after his family emergency, Kamian traveled to Vienna, Austria, to "pack out" but did not make time to complete the evaluation.

85. The Plaintiff tried to help Kamian meet the deadline by drafting the evaluation in its entirety, but he refused to sign it.

86. The uncertainty of the Plaintiff's evaluation – coupled with the fact that the Plaintiff had to take four weeks of Congressionally mandated home leave from late July 2021 to late August 2021 – caused the Plaintiff unnecessary stress and anxiety.  Since the evaluation report is supposed to be a negotiated document, the Plaintiff was disadvantaged by having to complete it after Kamian departed post, limiting her ability to negotiate changes.

**87.** Kamian finally sent a draft evaluation report to the Plaintiff on July 26, 2021.

**88.** In retaliation for the Plaintiff's lawfully protected EEO activities, Kamian refused to strongly recommend the Plaintiff for promotion.

**89.** In the Foreign Service, slight degrees of variation in evaluation language make the difference between someone being promoted or not.  For example, if a supervisor really wants a subordinate to be promoted, the supervisor will say, "Promote him/her now" or "Promote him/her as soon as possible."  In the present case, Kamian refused to include strong language recommending the Plaintiff for promotion to the Senior Foreign Service.  The Plaintiff pointed out that Kamian's proposed language, "Seriously consider [the Plaintiff] for promotion," was meaningless since the promotion boards must "seriously consider" every candidate for promotion.  In fact, that language is code for "do not promote."

**90.** The Plaintiff attempted to negotiate the phrasing of her performance evaluation with Kamian.  Kamian refused; and in an email dated July 28, 2021, stated, "To ensure the integrity of the process and the integrity/credibility of my assessment of your performance and potential during the very brief time we worked together, I must include only language that I as your rating officer can and do stand behind.  I therefore cannot accept the latest language that you have written and proposed below."  He then said, "With this, I have now completed my rating officer statement and will work directly with Gillian to ensure it fits in the form."

**91.** Kamian's assertion that he did this to "ensure the integrity of the process" rings false, since, as documented above, the evaluation was late and completed after he departed post, both violations of established procedures and regulations.  (Email from Kamian from July 28, 2021)

92. There were also objective indicators that the Plaintiff earned a recommendation for promotion and should have been recommended for promotion but for retaliation. The Plaintiff had provided Kamian with an email from the OIG assessing the Plaintiff's leadership and management as within the "top 10%" of all DCMs inspected and with a letter from the Secretary of State that praised the Plaintiff's organization of the Secretary's visit to Reykjavik May 18 – 21, 2021. In his email from July 28, 2021, Kamian was unable to articulate a reason why the Plaintiff should not be promoted, which is further evidence that the action was retaliatory. (OIG email from April 20, 2020; Secretary letter)

93. On July 28, 2021, the Plaintiff emailed Murphy, Kamian's day-to-day supervisor, with concerns about Kamian's refusal to recommend her for promotion. The Plaintiff wrote: "Due to Harry's understandably abrupt departure from post, we were unable to complete my EER before he left. I am reaching out to you for guidance/assistance as Harry and I have been negotiating for the past few days about his language concerning my promotion potential. As you know, since January, I have played a critical role in the normalization of post operations and I was the lead officer for our OIG preparation, as well as for the S visit - both resounding successes. The OIG may have shared with you that they assessed my leadership and management skills in the top 10% of the DCMs they inspected in the past four years. This is why I am perplexed that Harry has not recommended me for promotion. His proposed language suggesting that the boards seriously consider me for promotion if I open my window is a hollow endorsement, as the boards must seriously consider every FS-01 who opens his/her window. In his latest email, he said he considers his rating statement to be final. However, I remain concerned that his non-recommendation does not reflect my performance this rating period and hurts my chances for promotion."

94. Murphy agreed to speak with the Plaintiff by telephone on July 30, 2021.  During that call, however, Murphy told the Plaintiff it would be "inappropriate" for him to overrule Kamian's non-promotion language.  In fact, Murphy was Kamian's day-to-day supervisor, and as such, he had the authority to direct Kamian to recommend the Plaintiff for promotion.  (July 29, 2021, Email to Michael Murphy)

95. The evaluation report was finalized and entered the Plaintiff's Official Personnel File on August 29, 2021 – 75 days after Kamian departed post and 45 days after the official due date.

96. The lateness of the evaluation report reflects negatively on the Plaintiff because the promotion panels see the date that evaluation reports are filed.  In fact, the regulations specify that when a report is filed late, there must be attribution of blame, but in this case, there was no explanation of the lateness, which could imply it was the Plaintiff's fault, further harming her "corridor reputation" resulting in a loss of financial benefits.

## Part V. Causes of Action

## Count I: Race and Sex Discrimination under Title VII

97. Plaintiff reincorporates by reference all the allegations above.

98. At all pertinent times, the Defendant was an employer subject to the provisions of Title VII, 42 U.S.C. §2000 et seq.

99. Defendant discriminated against the Plaintiff on the basis of the Plaintiff's race and ethnicity (Native American) and sex (female) in violation of Title VII by denying the Plaintiff equal terms and conditions of her employment.

100.    As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits, and other privileges and entitlements of employment, loss

of professional status and career enhancing and advancement opportunities and loss of

retirement savings and benefits. The Plaintiff has also suffered from emotional distress

arising from the demotion from her job in January 2021, the damage to her professional

reputation and the embarrassment, humiliation, and indignity arising from the discriminatory

conduct of Defendant and/or agents or employees acting on its behalf, and stress and anxiety

and resultant financial hardship.

101.    As a consequence of Defendant's action, it is additionally liable for attorney's fees and

other costs and interest in pursuit of this litigation.

## Count II. Hostile Work Environment/Harassment under Title VII

102.    Plaintiff reincorporates all the allegations above.

103.    At all pertinent times Defendant was an employer subject to the provisions of Title VII.

104.    At all pertinent times, Plaintiff was an employee of the Defendant entitled to protection

under Title VII.

105.    Plaintiff was subject to a hostile work environment and unwelcome harassment by

Defendant, its agents, or its employees based on the Plaintiff's race, ethnicity and/or sex

(female).

106.    This harassment was so severe or pervasive as to alter the terms, conditions, and

privileges of Plaintiff's employment.

107.    Defendant's acts of harassment were deeply offensive to the Plaintiff, and prevented the

Plaintiff from concentrating at work. The harassment was imputable to the employer.

Defendant's acts of harassment caused Plaintiff to suffer economic losses, mental and

emotional distress, embarrassment, humiliation and indignity. This intentional, reckless,

and/or willful harassment by the Defendant constitutes a violation of Plaintiff's statutory rights under Title VII.

108.    By reason of Defendant's harassment and violation of Title VII, Plaintiff is entitled to all legal and equitable remedies under Title VII.

## Count III. Retaliation Under Title VII.

109.    Plaintiff reincorporates by reference all the allegations above.

110.    Plaintiff engaged in protected activities and opposition to practices made unlawful under Title VII while employed by the Defendant.

111.    As a result of her protected activities and opposition to practices made unlawful under Title VII, Plaintiff was subjected to multiple adverse employment actions, including demotion from a Charge d'Affaires (CDA) to a Deputy Chief of Mission (DCM), a negative performance evaluation, and/or a delayed performance evaluation, any and all of which, affects the Plaintiff's corridor reputation within the Agency, harms her monetarily and affects her chances for promotion within the Agency.

112.    A casual connection exists between Plaintiff's protected activities and the adverse employment actions taken by Defendant. Any or all of these acts could well have dissuaded "a reasonable worker from making or supporting a charge of discrimination." *Rattigan v. Holder*, 643 F.3d 975, 986 (D.C. 2010)

113.    Because of the close proximity of the protected activity and the adverse actions, a causal link can be established proving retaliation, which would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

114.    As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered

and is suffering considerable injury, including but not limited to loss of substantial past and

future salary and income, benefits and other privileges and entitlements of employment, loss

of professional status and career enhancing and advancement opportunities and loss of

retirement savings and benefits.  The Plaintiff has also suffered from emotional distress

arising from the demotion in January 2021, the damage to her professional reputation and the

embarrassment, humiliation, and indignity arising from the discriminatory conduct of

Defendant and/or agents or employees acting on its behalf.

115.    As a consequence of Defendant's action, it is additionally liable for attorney's fees and

other costs and interest in pursuit of this litigation, and all other remedies under Title VII.

## Part VI. Relief Sought.

**WHEREFORE**, the Plaintiff Michelle Yerkin respectfully requests this Court award economic

damages to be proved at trial, and in addition:

A. Enter judgment for the Plaintiff Michelle Yerkin against the Defendant the U.S Department of

State, on all Counts, in an amount to be determined by the jury;

B. Declare that the conduct of Defendant is in violation of Title VII, 42 U.S.C Section 2000 *et

seq*.,

C. Award the Plaintiff full back pay and front pay, including salary, benefits, entitlements, loss

of professional status and career-enhancing opportunities, bonuses', cash awards, loss of

retirement savings and benefits and other remuneration and privileges of employment retroactive

to the date of any unlawful employment action found to have occurred in this case.

D. Award the Plaintiff compensatory damages for emotional distress injuries and loss;

E. Award Plaintiff pecuniary and out of pocket expenses;

F. Order Defendant to pay all reasonable attorney's fees, court costs, and expenses incurred by

Plaintiff as a result of Defendants' actions and inactions, as well as pre-judgment and post-

judgment interest; and

G. Other such equitable and legal relief as the Court deems appropriate.

## **Part VII. Jury Trial Demanded.**

Plaintiff demands a jury trial for all counts in this action.

*Respectfully Submitted*,

/s/A.J Dhali, Esq.

DC Bar No. 495909

Dhali PLLC

1629 K. Street. NW. Suite 300.

Washington D.C. 20006

Telephone: (202) 556-1285

Fascimile: (202) 351-0518

ajdhali@dhalilaw.com

*Attorney for Plaintiff Michelle Yerkin*

*Monday December 27, 2021*

The New York Times
https://www.nytimes.com/2020/06/27/us/politics/a-reckoning-with-race-to-ensure-diversity-for-americas-face-abroad.html

# A Reckoning With Race to Ensure Diversity for America's Face Abroad

The national conversation about discrimination is overdue at the State Department, according to those who have been disparaged in a culture that favors "pale, male and Yale" diplomats.

**EXHIBIT A**

 **By Lara Jakes**

June 27, 2020

WASHINGTON — Tianna Spears dreamed for years of becoming an American diplomat. She quit in January after two, and says she will never return to the State Department, given what she has described as its failure to protect her from racial discrimination — from the United States government — while on the job.

Ms. Spears is black. Her first foreign post, in 2018, was at the American Consulate in Ciudad Juárez, just over the Mexican border from El Paso. Over six months, she said, U.S. border officials pulled her aside about 25 times for extensive questioning and inspections.

She was asked if she was a drug dealer. At one point, she said, she was told to not look a male officer in the eye. The Customs and Border Protection officers questioned whether her diplomatic passport was counterfeit. At times she felt threatened. And her white colleagues, Ms. Spears said, appeared to cross the border easily and without delay.

When she reported the episodes to her supervisors at the consulate, Ms. Spears said she was advised against speaking out and was transferred to the U.S. Embassy in Mexico City.

"The message was: 'You are now in Mexico City — focus on your job and be quiet,' " Ms. Spears said in an interview last week.

Officials at Customs and Border Protection in Washington have denied Ms. Spears's accusations, and said in a statement that it conducted a two-month internal investigation that "found no evidence of misconduct." In its own statement, the State Department said it took Ms. Spears's allegations "very seriously."

The State Department statement also said it was working to "increase the diversity of our work force and foster a more inclusive organization." But Ms. Spears's case, first revealed in a blog post that she published last month after the killing of George Floyd, has struck a nerve in the American diplomatic corps.

It illustrated what current and former officials described as a State Department culture of endemic slights and disparaging treatment of employees who are people of color and women, prompting their exodus and whitewashing diversity from the face of the United States abroad.

Last week, the American Embassy in Seoul removed a Black Lives Matter banner that had hung from its building for three days. It had meant to show "our support for the fight against racial injustice and police brutality as we strive to be a more inclusive & just society," according to the mission's official Twitter site.

Officials later said it was taken down to avoid any appearance of support to any specific organization, even though the American ambassador in Seoul, Harry B. Harris Jr., had tweeted a picture of it to note that with "diversity we gain our strength." Mr. Harris is Japanese-American.



A Black Lives Matter banner hanging from the American embassy in Seoul, which was later removed.  Yonhap/EPA, via Shutterstock

That was followed by the departure of the department's only African-American assistant secretary of state, who resigned over President Trump's heavy-handed response against mostly peaceful protests that have demanded greater equality for black people after the deaths of Mr. Floyd and others in cases of police brutality.

"The president's comments and actions surrounding racial injustice and Black Americans cut sharply against my core values and convictions," Mary Elizabeth Taylor, a political appointee who oversaw the State Department's interaction with Congress, wrote in her resignation letter.

That the State Department has long been filled with "pale, male and Yale" diplomats, as the common refrain goes, is well established. What is new is what Uzra Zeya, a former acting assistant secretary of state who is Indian-American, described as an opportunity in "this watershed moment for America" amid a national conversation about eradicating discrimination.

Ms. Zeya, who retired in 2018 after 27 years in the Foreign Service, said that the conversation was long overdue at the State Department, where she and others recounted futile attempts to report bias or appeal adverse career assignments, only to be brushed aside.

In her case, Ms. Zeya said, she was given no official explanation for being blocked from senior leadership assignments after serving as the chargé d'affaires — the No. 2 spot — at the U.S. Embassy in Paris during the Trump and Obama administrations. Instead, she was quietly told that she and another female diplomat, who is African-American, did not pass the "Breitbart test" — a reference to the conservative news site that she understood to mean political loyalty toward Mr. Trump, despite the State Department's nonpartisan mission.

"I did feel that I didn't look the part, despite the fact that my performance was beyond reproach and bulletproof," said Ms. Zeya, who is now chief executive for the nonpartisan Alliance for Peacebuilding.

**Sign Up for On Politics**  A guide to the political news cycle, cutting through the spin and delivering clarity from the chaos. Get it sent to your inbox.

"It was certainly something I never imagined," she said. "And the inability of the department to address it was also profoundly disappointing, and gave me no choice in the end but to leave the institution that I had devoted most of my adult life to supporting."



"I did feel that I didn't look the part, despite the fact that my performance was beyond reproach and bulletproof," said Uzra Zeya, who was the No. 2 diplomat at the American Embassy in Paris.  Jacques Demarthon/Agence France-Presse — Getty Images

The State Department employs around 76,000 people worldwide, about one-third of whom are career Foreign Service officials and Civil Service employees.

Black employees make up 15.3 percent of the Foreign Service and Civil Service employees, a slightly higher average than the 13.4 percent of African-Americans in the national population. About 7.3 percent of the career employees are Asian — slightly more than the 5.9 percent average.

Hispanic employees are far underrepresented, making up 7.4 percent of the department's career work force despite accounting for 18.5 percent of the population. And 44.1 percent of career State Department employees are women, compared to a population that is 50.8 percent female.

Far fewer women and minority employees hold senior-level career jobs at the State Department. Women make up 36.3 percent of those posts, while Asians hold 5.3 percent, Hispanics hold 4.5 percent and black people 3 percent, according to State Department data as of last March, the most recent available.

Promotion rates in the Foreign Service, the elite diplomatic corps, paint an even starker picture.

Data provided to The New York Times show that only 80 black Foreign Service officers and specialists were promoted in the 2019 fiscal year — 1 percent of 8,023 diplomats who competed.

The promotion process is highly competitive and, over all, only 1,496 diplomats were selected, the 2019 data show. That included 108 Hispanics, 106 Asians and 90 people of other minority group. Promotions were given to 549 women. The overwhelming majority of promotions went to white men.

Of 198 ambassadors currently serving in embassies overseas, only three career envoys are black; another four are Hispanic, according to the American Academy of Diplomacy.

In a letter to employees this month, Secretary of State Mike Pompeo said that department officials were working "diligently to find the best, most committed and broadly diverse talent to deliver excellence in American diplomacy."

"I am proud that the composition of our State Department work force also reflects America's devotion to the principle of equal opportunity,"

Mr. Pompeo said.

Fellowships and other recruiting programs specifically looking to hire people of color have been underway for years at the State Department. But in some cases, they have also had the unintended effect of adversely singling out its recruits among their peers.

A former diplomat, Kashia Dunner, joined the Foreign Service after winning a Charles B. Rangel diversity fellowship in 2010. During introductory training courses, she said, the award became more of a stigma than an honor as white classmates routinely assumed that the minority students had qualified only because of the fellowship.

"I suddenly felt really ashamed and embarrassed about it," said Ms. Dunner, who is black.

Later, while serving at the U.S. Consulate in Tijuana, Mexico, she said she was advised against participating in Black History Month events because they would "typecast" her. She also was told that she intimidated others because of her height, race and hair.

Filing an Equal Employment Opportunity complaint became a struggle that she believed would make little difference, and otherwise speaking out or pushing back risked damaging her "corridor reputation" — a peer-enforced system with an outsize influence when selecting diplomats for choice assignments.



In a letter to employees this month, Secretary of State Mike Pompeo said that department officials were working "diligently to find the best, most committed and broadly diverse talent to deliver excellence in American diplomacy." *Pool photo by Mandel Ngan*

In 2016, while posted at the U.S. Consulate in Erbil, Iraq, Ms. Dunner earned an annual State Department human rights award for her work with ethnic and religious minorities who had been victimized by Islamic State fighters. But at her next assignment, in San Salvador, "my boss at one point just told me flat out, 'Your work is fine, but we just don't like you,' " she recalled.

"How do you recover from that?" she said.

She left the Foreign Service in 2017. The State Department declined to discuss the specifics of her case but said in a written statement that "if the allegations are true, she deserved better during her time here."

Congress has become increasingly worried about the lack of diversity at the State Department and the number of diplomats of color who voluntarily leave.

"People who bring diversity to the State Department will help us more than others, because we'll have a Foreign Service that reflects America," Representative Brad Sherman, Democrat of California, said at a virtual hearing last week.

As with other federal agencies, the State Department is working on diversity and inclusion plans to recruit, retain and promote more women and employees of color. "We have built an inclusive workplace in which every employee is treated with dignity and respect and feels empowered to serve the American people," the department said in a statement in November.

Two months later, Ms. Spears left the State Department, having been told by an embassy medical official that she had developed anxiety, depression and post-traumatic stress disorder. She attributes it to her interactions with the border guards and "unresolved trauma" that no one was held responsible.

"People are starting to ask themselves these questions that aren't difficult, like if black lives matter," she said in the interview. "The State

Department, America's government institutions, have a responsibility to create a change. And the rest of us are waiting to see how they respond."

Lara Jakes is a diplomatic correspondent based in the Washington bureau of The New York Times. Over the past two decades, Ms. Jakes has reported and edited from more than 40 countries and covered war and sectarian fighting in Iraq, Afghanistan, Israel, the West Bank and Northern Ireland.  @jakesNYT

A version of this article appears in print on , Section A, Page 22 of the New York edition with the headline: State Dept. Wrestles With Culture Skewing 'Pale, Male and Yale'

CBS News App | Gift Guide 2021 | CBSN Live Stream | CBS Newsletters | CBS News Full Episodes | COVID Pandemic

☰  ◉ CBS NEWS                                              🔍      **Login**

# Controversial U.S. Ambassador to Iceland wanted firearm, security for Reykjavik post

EXHIBIT B

BY CHRISTINA RUFFINI
JULY 26, 2020 / 6:23 AM / CBS NEWS

The U.S. Ambassador to Iceland wanted to carry a gun.

Despite being assigned to one of the safest countries in the world, Jeffrey Ross Gunter has been "paranoid" about his security since coming to Reykjavik last year, according to a dozen diplomats, government officials, former officials and individuals familiar with the situation. As a result, Gunter wanted the State Department to obtain special permission from the Icelandic government for him to have a firearm. They say he also wanted door-to-door armored car service, and entertained the idea of wearing a "stab-

proof vest."

The State Department declined to say if there is any credible threat to Gunter's safety, but U.S. government officials told CBS News the ambassador has been informed multiple times that he is at no extraordinary risk. Regardless, the embassy recently placed a jobs listing in Icelandic newspapers looking for local, full-time "bodyguards." Those same officials said they believe security is being augmented to placate Gunter's "irrational" concerns.

## Sign up for Breaking News Alerts

enter your email

**Sign Up**

By signing up, you agree to the CBS Terms of Use and acknowledge the data practices in our Privacy Policy.

☐ Receive updates, offers & other information from the CBS family of companies & our partners. Opt out through the unsubscribe link in any marketing email.

"Protection programs for our leadership are standard features at most U.S. facilities around the world," a State Department official said when asked about the "bodyguard" position. "While the U.S. government does not comment on specific security measures, our goal around the world has always been to be proactive with security measures."



Jeffrey Ross Gunter
U.S. DEPARTMENT OF STATE

The State Department did not directly address a question about Gunter's desire to arm himself. The Icelandic Ministry for Foreign Affairs declined to say if the U.S. ever officially sought permission for the ambassador to have a gun, adding that they "generally do not comment on the security details of diplomatic missions." However,

local sources in Reykjavik said the request was never made, and three diplomatic sources told CBS news Gunter was talked out of pursuing self-armament because it would be perceived as an insult to the host nation.

But other issues with the California dermatologist and GOP donor-turned-diplomat persist.

Since his nomination in May 2019, Gunter has created an increasingly "untenable" working environment at the Embassy in Reykjavik, according to current and former diplomats familiar with the situation. He has already had seven Deputy Chiefs of Mission (DCM's), experienced Foreign Service Officers who traditionally serve in the number-two job.

The first deputy prepared for more than a year and spent months learning Icelandic, only to be blocked from coming to post because, according to a State Department official, Gunter reportedly "didn't like the look of him" at their introductory meeting. The second DCM made it to Iceland, but only lasted six months.

After that, Gunter tried to persuade frustrated officials in the European Bureau he didn't need a DCM and could manage the relatively small mission on his own, diplomatic sources told CBS News.

Unconvinced, they set up a rotation system until a suitable candidate could be found.

"In order to ensure continuity of support for Embassy Reykjavik while Ambassador Gunter selected a new, permanent DCM, the State Department also deployed four experienced career foreign service officers to serve short-term details as Acting DCM from January 2020 to June 2020," a State Department spokesperson said when asked about the high turnover. "These temporary duty assignments were of short duration by design."

But Gunter didn't get along with the acting deputies either. According to three individuals familiar with the situation, the ambassador once "flew into a rage" because a DCM left snow boots under their own desk in the middle of the Icelandic winter. Sources said he accused others of various, unsubstantiated infractions, including trying to undermine him to Washington and being complicit with the "deep state."

Senior leadership at the State Department is well-aware of the trouble in Iceland, according to current and former agency officials, but has been reluctant to take action against anyone perceived to have close ties to the White House. Supervisors have also had difficulty getting Gunter to follow protocol or respect the chain of command. In February, after attending a conference in Washington, Gunter refused to return to Iceland – leaving a temporary deputy in charge on the ground for months, in the middle of a global health crisis.

"Ambassador Gunter had scheduled personal leave after the Chief of Mission conference," a State Department spokesperson told CBS News when asked about the absence. "His return to Iceland was delayed because of the COVID-19 pandemic."

But multiple sources in Washington, Reykjavik and elsewhere said Gunter wanted to work remotely from California and told senior officials he would not go back overseas unless expressly ordered to do so by Secretary of State Mike Pompeo. Those sources were unclear if Gunter wanted to stay in the US because he was worried about the virus or had other, unspecified safety concerns.

Increasingly higher-ranking individuals tried and failed to get the ambassador back to post. Eventually, a State Department Official told CBS News, Pompeo had to call Gunter directly. The exchange was described as "polite" and "gentle," which the official speculated may have been to avoid angering a potential future political donor. Pompeo is widely expected to run for office after his term ends, though he has repeatedly denied it.

Having heard from on high, Gunter finally returned to Iceland in May. His new DCM, Michelle Yerkin, arrived this month. CBS News attempted to reach Gunter for comment multiple times through the State Department press office, the embassy in Reykjavik and directly by email, but did not hear back.

Icelandic officials declined to comment on any specific incidents or characterize their interactions with the American ambassador, but he has become an increasingly controversial figure in his host country. Earlier this week Gunter drew widespread ire for referring to COVID-19 as "the Invisible China Virus!" on Twitter. Many Icelanders said the phrase was offensive and ethnocentric.

Gunter is one of a number of Trump administration appointees with little or no foreign policy experience now filling top jobs at American embassies around the world.

Woody Johnson, owner of the New York Jets and ambassador to the United Kingdom, is reportedly under investigation by the State Department Inspector General for making inappropriate comments to his staff, a claim he refuted as "false" on Twitter, and trying to get the British Open moved to a Trump resort. The President said he never spoke to Johnson about moving the tournament and Johnson has declined to discuss this with the press.

In South Africa, handbag designer and frequent Mar-a-Lago visitor Lana Marks dismissed her DCM and then allegedly tried to promote her son to a senior-level position. A senior embassy told Foreign Policy the claim was "totally inaccurate" and the two issues were unrelated.

"In fairness, this has been a problem in other administrations" said career Foreign Service office and three-time ambassador Ronald E. Neumann. "It has not been as bad a problem or as frequent."

Forty-two percent of current American ambassadors are political appointees, according to the American Foreign Service Association. That's up from 30 percent in the Obama administration and 32 percent under George W. Bush. But Neumann, who now runs the American Academy of Diplomacy, said the percentage of political appointees isn't as important as making sure they are qualified to do the job.

"Its not all one thing or the other," he said. "They have appointed some competent people, but they have also appointed an excessive number of incompetent people who are an embarrassment to the nation."

The State Department did not comment when asked if the Secretary still has confidence in his Ambassador to Iceland.

---

# Trending News

*First published on July 26, 2020 / 6:33 AM*

**Court allows Biden's COVID vaccine rule for large companies to take effect**

*© 2020 CBS Interactive Inc. All Rights Reserved.*

**What's behind the push for a fourth stimulus check**

**Nightmare before Christmas: What to know about the Log4j vulnerability**

Copyright © 2021 CBS Interactive Inc. All rights reserved.

**Privacy Policy**                              **Closed Captioning**

**Man who assaulted officers with fire extinguisher on Jan. 6 sentenced**

**Do Not Sell My Personal Information**        **CBSN on Paramount+**

**Cookies Policy**                             **CBS News Store**

**Terms of Use**                               **Site Map**

**About**                                      **Contact Us**

**Christina Ruffini**

**Advertise**                                  **Help**

CBS News correspondent

Case 1:21-cv-03373   Document 1   Filed 12/27/21   Page 36 of 36